UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JEAN T. DIMARIA, Individually, and as Administratrix of the Estate of GARY DIMARIA, and Derivatively on behalf of CONTRACT FURNITURE TRANSPORT, INC., CONTRACT FURNITURE TRANSPORT ASSOCIATES, INC., CONTRACT FURNITURE WAREHOUSE CORP., CONTRACT FURNITURE PAINTING, LLC, CONTRACT FURNITURE INSTALLATIONS, LLC, DEPENDABLE MOVING AND STORAGE, INC., DEPENDABLE MOVING AND STORAGE CORP., SERVICE EAST, INC., and CONTRACT FURNITURE TRANSPORTATION, LLC,

                        Plaintiffs,

- against -

MARTIN GOOR, CFT-IOS, INC., RYAN GOOR, STEVEN MITNICK, ESQ., as Assignee for the Benefit of Creditors for CONTRACT FURNITURE TRANSPORT, INC. and CONTRACT FURNITURE TRANSPORT, ASSOCIATES, INC., CONTRACT FURNITURE TRANSPORT, INC., CONTRACT FURNITURE TRANSPORT ASSOCIATES, INC., CONTRACT FURNITURE WAREHOUSE CORP., CONTRACT FURNITURE PAINTING, LLC, CONTRACT FURNITURE INSTALLATIONS, LLC, DEPENDABLE MOVING AND STORAGE, INC., DEPENDABLE MOVING AND STORAGE CORP., SERVICE EAST, INC., and CONTRACT FURNITURE TRANSPORTATION, LLC,

                        Defendants.

**AFFIDAVIT OF**
**MARIE KNEE**

---

STATE OF NEW YORK    )
                                  ) ss.:
COUNTY OF NEW YORK )

       Marie Knee, being duly sworn, deposes and says:

       1.    I am the niece of Plaintiff Jean T. Dimaria in this action and submit this affidavit in opposition to the motion for partial summary judgment made by Defendants Contract

Furniture Transport, Inc. ("CFT, Inc.") and Martin Goor ("Goor") and in opposition to the motions to dismiss filed by: (i) Contract Furniture Transport Associates, Inc. ("CFT Associates"), CFT, Inc. and Goor; (ii) Ryan Goor and CFT-IOS, Inc. ("CFT-IOS"); and (iii) the Assignee for the Benefit of Creditors Steven Mitnick, Esq. (the "Assignee") in the above captioned action. I make this affidavit based upon personal knowledge unless otherwise indicated.

2. I worked as Goor's executive assistant from 2001 until November 2009, when I was fired by him when he put CFT out of business.

3. After my uncle Gary DiMaria died, on various occasions Goor told me in words and substance that "he would take care of the family." Unfortunately, I was unaware of what he really meant by that. My aunt has now found out the hard way!

4. My responsibilities at CFT included, among other things, addressing account receivables and loans and other book keeping functions; interacting with customers and vendors; billing and paying bills; stamping Goor's name on checks, answering phone calls directed to management, as well as other general administrative functions. I also did certain of Goor's filings for him as well as filings for CFT.

## CFT DOCUMENTS

5. I need to make something clear about Goor – he is "saver" and he rarely discards documents. For that reason, when I was informed that he produced virtually no documents to Plaintiff's counsel and instead compelled them to review documents for relevant materials at CFT's warehouse I knew that would be like looking for the proverbial "needle in a haystack" to discover pertinent information.

6. I have also been advised by Plaintiff's counsel that when Plaintiff's counsel went

2

to CFT's warehouse to review CFT's "older" documents that Goor had stored in the warehouse on skids (and which review I am advised was due to an order of Magistrate Judge Levy), in CFT's offices adjacent to the warehouse, counsel found documents thrown in the garbage that pertained to CFT. That documents were thrown out is something that Goor would never typically do, so that if documents were found in the garbage it raises suspicions as nobody would ever throw out documents at CFT without Goor's permission. When, however, Goor was asked the question at his deposition whether "[d]id he ever give instructions to anybody to discard or throw out CFT documents", his curious answer was equivocal -- "I don't believe so." (Ex. C, Goor Dep. Tr. at 50)

7. I have been advised that Goor and CFT have not produced any drafts of any stockholders agreement or any insurance-related documents that Goor refers to as being pertinent to the interpretation of stockholders' agreement, and has testified that he is unaware of the existence any such documents, and that Gary DiMaria kept both insurance policies, even his. (Ex. C, Goor Dep. Tr. at 29-35) I need to note that Goor is not the type to let anyone hold something like an insurance policy other than himself, and I simply do not believe Goor's testimony based on his practices that I observed during my nine years working for him.

8. The fact is that, as of when I was employed by CFT, to wit, until November 2009, there was at least one file contained in a cabinet drawer in the accounting area that held draft stockholders' agreements and insurance-related documents. I do not know if such copies were the same as the stockholders' agreement that is subject to this litigation or whether the insurance policies are the ones discussed by Goor in his affidavit, but such documents existed as of November 2009, and his testimony clearly calls into doubt that he would be unaware of any place to look to see if he could determine the name of the insurance broker upon who he relied.

3

(Ex. C, Goor Dep. Tr. at 35)

9. I also have been advised that, before Plaintiff's counsel had an opportunity to review CFT's "active" documents contained in file cabinets, all such documents were removed, boxed up, and taken to CFT-IOS' new warehouse, and stored there. I have been advised that some of the boxed up formerly "active" documents were then re-boxed and taken by the accountants for the Assignee for the Benefit of Creditors. The accountants for the Assignee for the Benefit of Creditors stored some of those documents in its warehouse, and some are stored in the accountants' main office. As such, some of CFT's documents may now be unlocateable or even have been discarded.

10. I am aware that corporate documents concerning CFT were maintained by Goor in the company safe located under Rachel Fiori's desk; Ms. Fiori was the former Chief Financial Officer of CFT. When Ms. Fiori was fired by Goor, he removed the corporate documents and stored them in his office. Again, I do not know what those documents were, but I have been advised that corporate documents of CFT have not been produced or made available.

11. As for emails, Goor gave me direct access to his emails several years before Mr. Dimaria passed away, even though I understand that he testified to the contrary. (Ex. C, Goor Dep. Tr. at 54-55) Goor was a vociferous user of email. Once Mr. DiMaria died, Goor took away the direct access he had previously given me to his emails. To my knowledge, only Goor's son, Ryan Goor the putative head of CFT-IOS, was the only person who had direct access to his father's emails after that.

12. Goor is a "keeper" of emails, and keeps them well-organized on his computer. When I was advised by counsel for Plaintiff that Goor has not produced any emails, I was shocked, as there should be tens of thousands of them. That he hoards and maintains emails is

4

demonstrated by the fact that periodically CFT's outside IT person had to come to unclog his computer "outlook" inbox, where he maintained his emails, and for them to be archived. I am very surprised that Goor testified that he has no memory of this occurring as it occurred on multiple occasions. (Ex C., Goor Dep. Tr. at 76-79) In any event, I can only imagine that pertinent information to Mrs. DiMaria's case would be contained in those emails that have not been produced.

13. I also understand that Goor testified that he personally "did not know how to search" for emails on his computer, and that he relied on me to do so. (Ex C., Goor Dep. Tr. at 53-55) The fact is that while I was more proficient in searching for emails than he, he performed searches for emails, and he frequently and successfully searched for emails on his computer, and did so regularly using Microsoft's Outlook' search feature. Goor is simply not telling the truth about his ability to search for emails, and, indeed, I have been advised that he provided at least one email to Plaintiff's counsel for their review. See Declaration of Richard J. Shore, at ¶ 9, Ex. "EE".

14. CFT's email domain was first "cft-ld.com" and then "cftdelivers.com". As noted below, this is demonstrative of the fact that CFT, Inc. and Contract Furniture Transport Associates, Inc. ("CFT Associates") are intertwined and *alter egos* of themselves.

### THE CFT STOCKHOLDERS' AGREEMENT

15. I was aware of the existence of a stockholders' agreement between Messrs. Goor and DiMaria. I became aware of this because, at various times since 2001, they each acknowledged to me at one time or the other of its existence, and I was told that it governed their business relationship. I could only imagine that it applied to CFT generally, because if it was limited to a certain entity, either Goor or Mr. Dimaria would have advised me of such limitation.

5

I have never read the document and do not know to what entity(s) it applied. However, I have come to learn that Goor's position is that the agreement applies only to CFT, **Inc.** I would find it surprising that Mr. Dimaria would have believed that the agreement was solely limited to such entity for the reasons set forth below.

### CFT, INC AND CFT ASSOCIATES ARE ALTER EGOS OF EACH OTHER

16. CFT, **Inc.** paid the salaries of the principals and the staff of the CFT organization, including those who performed work for CFT **Associates**. That CFT **Associates** cannot be unwound from CFT, **Inc.** is further demonstrated by the fact that even while CFT, **Inc.** paid the salaries of the CFT principals, it was CFT **Associates** that paid those same principals' health insurance. I find it outrageous that Goor testified yesterday that he "can't tell" "what entity paid the principals' salaries, the principals and employee's health insurance." (Ex. C, Goor Dep. Tr. at 42). Goor has been reviewing those checks for years, and that he was unable to answer this simple question demonstrates his complete lack of candor.

17. Indeed, it was through CFT, **Inc.** that CFT's principals received their cash distributions, and that was so even though CFT, **Inc.** was *not a profit center*, and did not take in revenues. To fund such payments, including the payment of insurance and other administrative expenses of the CFT umbrella, CFT **Inc.** would weekly receive infusions of funds from other CFT entities including CFT **Associates**. Of course, as noted below, there were times that even CFT **Associates** paid invoices for CFT, **Inc.**

18. Significant to the operation of CFT was payment of the rent for its warehouse. While Contract Furniture Warehouse Corp. was the tenant under the lease, and paid such rent, it was CFT **Associates** that contributed to the payment of such expense. It was my understanding that Messrs. Goor and DiMaria sought to separate the entity that held contractual liabilities from

6

the entity that was a *profit center*.

19.  In any event, the following documents demonstrate the *alter ego* status of each entity to the other. One only need to start with the fact the relevant application for authority to do business in New York, under BCL section 1304, states that [t]he name of the corporation in the jurisdiction of its incorporation is [**CFT Associates**]," but "[i]n the State of New York the corporation will use the fictitious name [**CFT Inc.**]"[1]

20.  The New York State Department of Transportation refers to CFT **Inc.** and CFT **Associates** as one in the same, **doing business as each other**.[2] The New York State Department of Transportation regarding the same case number, T-12486, as in Exhibits G and H, refers to Associates as **doing business as** Contract Furniture Transport (*without any entity designator*).[3]

21.  Moreover, "CFT" and "Contract Furniture Transport" are generally used to refer to either CFT **Inc.** or CFT **Associates** or both together. Communications, including facsimiles and e-mails *from* Associates and **Inc.** were transmitted under the heading of "CFT" or "Contract Furniture Transport" with no distinction for CFT **Inc.** or CFT **Associates**.[4] Communications *to* CFT **Associates** and CFT **Inc.** were made to Contract Furniture Transport generally without a distinction to either CFT **Inc.** or CFT **Associates**.[5] In fact, even *internal* communications

---

[1]  A copy of the New York State BCL 1304 application is annexed hereto as Exhibit "F"

[2]  Copies of letters and certifications from the State of New York Department of Transportation to "Contract Furniture **Associates**, Inc. **d/b/a** Contract Furniture Transport, **Inc.**" are annexed hereto as Exhibits "G" and "H".

[3]  A copy of letter from State of New York Department of Transportation is annexed hereto as Exhibit "I".

[4]  A copy of an e-mail chain, with an e-mail from Marty Goor, President of "Contract Furniture Transport" is annexed hereto as Exhibit "J".

[5]  A copy of a letter addressed to "CFT" is annexed hereto as Exhibit "K".

referred to CFT **Inc.** and CFT **Associates** together.[6] Not only were most communications under the heading of CFT or Contract Furniture Transport, but CFT **Associates** referred to CFT **Inc.** under the overarching "CFT" and itself as well, under the same overarching "Contract Furniture Transport."[7]

22. Beyond how CFT **Inc.** and CFT **Associates** present themselves, and how the world perceives them, the CFT umbrella, including CFT **Inc.** and CFT **Associates**, *actually acted and functioned* as one single entity. For example, all of the finances of the CFT entities are kept together in binders, in the same cabinets, and/or in the same storage locations. Moreover, the expenses of all of the CFT Entities are, at times, kept on a single spreadsheet.[8] The employees of CFT **Inc.** and CFT **Associates** do not get separate pay checks from each entity, they share the same office, at the same address, with the same principals and employees.

23. The CFT Entities shared commonality of ownership, management and control, as well as liquidity of finances between them. The intertwining of the CFT Entities' finances is, *inter alia*, established by their joint accountant's filing of a "**Combined Statement**," on their behalf, which combined each entity's balance sheets, statements of income and retained earnings.

24. The entities regularly make intercompany loans to balance each other's books because the structures of the entities are irrelevant as the principles of the entities are the same in

---

[6] In the copy of the e-mail chain annexed hereto as Exhibit J, the e-mail chain includes an internal e-mail communication between Kenia Avila and Goor referring to the CFT Entities generally as "CFT".

[7] A copy of the December 31, 1997 Note to Financial Statement, referring to **Inc.** as "**CFT**" is annexed hereto as Exhibit "L", and a copy of checks to **Inc.** addressed to "Contract Furniture Transport", along with the corresponding **Inc.** deposit slip is annexed hereto as Exhibit "M". In addition, a copy of a New Jersey Urban Enterprise Zone Program Recertification Application for **Associates** using a trade name of "**Contract Furniture Transport**", is annexed hereto as Exhibit "N".

[8] A copy of September 2005 Expenses For All Companies is annexed hereto as Exhibit "O".

any case.[9] Indeed, CFT **Associates** pay for invoices owed by CFT **Inc.**[10]

The insurance coverage, workers compensation coverage, truck leases, and the mover transportation licenses are in the name of CFT **Inc.**, thus the activities of transporting and delivering furniture of CFT **Associates** operated through and were reliant on CFT **Inc.**, and CFT **Associates** could not have thus operated.[11]

## THE LACK OF CORPORATE FORMALITIES

25. CFT did not follow any corporate formalities. Shareholder and officer meetings did not take place nor did directors meetings and, of course, that would naturally mean that there were no corporate minutes. That is consistent with Goor's testimony that with respect to CFT minutes, resolutions, bylaws, notices and other corporate governance documents, that they do not "Exist, period. Existed, exist, past tense, present tense." See Ex. "C"; Transcript of Martin Goor Deposition, dated January 27, 2010, at 25-30.

26. After Gary DiMaria died, to my knowledge, there has been no vote of shareholders to elect new directors or officers of CFT and, even before he died, I am unaware of any such meetings taking place. As Goor's executive assistant, I would have been aware of such meetings or vote. All CFT entity books and records where all maintained jointly.

---

[9] A copy of a General Ledger documenting Intercompany loans is annexed hereto as Exhibit "P".

[10] A copy of an invoice from the NYC Department of Finance Commercial Motor Vehicle Tax Section addressed to **Inc.** is annexed hereto as Exhibit "Q" and a copy of a check from **Associates** to the NYC Department of Finance Commercial Motor Vehicle Tax Section paying the invoice is annexed hereto as Exhibit "R".

[11] A copy of National Motor Freight Traffic Association renewal letter to **Inc.** is attached hereto as Exhibit "S". In addition, demonstrative that **Associates** operates through **Inc.** are copies of the AIG Worker's Compensation Audit addressed to **Inc.**, an invoice for the AIG policy held in **Inc.**'s name, and a Worker's Compensation policy Extension Form for Inc. are annexed hereto as Exhibit "T".

Similarly, demonstrating that Associates operates through Inc. a copy of a letter from a law firm to **Inc.** regarding Manhattan Criminal Court action against **Inc.** for driving infraction is annexed hereto as Exhibit "U"; copy of the State of New Jersey Office of the Attorney General, Division of Consumer Affairs license for Public Movers and Warehousemen for **Inc.** is annexed hereto as Exhibit "V"; and a copy of the Addendum to the Mendon Trucking Lease and Rental Agreement executed by **Inc.** is annexed hereto as Exhibit "W").

## GOOR'S PERSONAL USE OF CFT FUNDS

27. Goor used the assets of CFT to fund his lavish lifestyle. The fact that he paid maintenance and expenses to his wife and former wives is legend at CFT, and that it had been going on for many years, well before Goor caused CFT, Inc. and CFT Associates to file Assignments for the Benefit of Creditors

28. More recently, I am aware that Goor used the funds of CFT **Associates** to pay for his personal and family expenses, and that occurred just prior to his causing CFT Associates to file an Assignment for the benefit of Creditors on or about November 17, 2009.

29. It also needs to be noted that while I was the person who stamped his name on checks, there were many checks that he handsigned which he specifically did not want me to see, and I do not know what they were for. I can only surmise that those checks were for non-corporate purposes.

30. However, what I found most obnoxious and egregious is that just prior to laying off some of his staff, including myself, and putting CFT out of business, he caused CFT Associates to pay for: (a) two months of his car; (b) three months of his wife's GEICO car insurance; (c) two additional months of CFT internet service; and (d) his entire American Express Credit Card, and these are the expenditures that I know of. There probably are many more that occurred throughout this year that I am unaware of.

## GOOR USED CFT MONIES TO START CFT-IOS

31. In addition, in early November, 2009, Goor caused CFT **Associates** to pay the heating bill for Ryan Goor's new business, CFT-IOS, Inc., located at 100 Enterprise Ave South. My understanding is that such actions are improper, especially where Goor has usurped corporate opportunities and precluded Mrs. DiMaria from her interest in CFT, while usurping

10

CFT entities assets (including Mrs. DiMaria's interests) to start CFT-IOS.

32. I have been advised by Plaintiff's counsel that CFT-IOS has no connection to the CFT entities, and that Defendants' position is that it is separate, unaffiliated entity. My understanding of the facts concerning the closing of CFT belies that position. In addition to Goor paying for CFT-IOS' heating bill, I watched as CFT's files were removed from the CFT offices for delivery to the offices of CFT-IOS. In addition, the women employed by CFT not laid off by Goor, resumed their new employment at CFT-IOS the day after Goor closed CFT on or about November 17, 2009.

33. As far as Ryan Goor is concerned, I have known him since he was a young boy and he is approximately twenty two years old now, and recently graduated from college. He has never run a company to my knowledge, and he did very little at CFT while a teenager, and while, in college, he only worked part-time at CFT (he was paid a quite substantial allowance by CFT nonetheless).

### GOOR GAVE AWAY CFT'S CLIENT RELATIONSHIPS AND "GOOD WILL" TO CFT-IOS

34. By way of background, the CFT Entities provided trucking and transportation-related services for the delivery of office furniture, and L&D supplied the labor to install such furniture. Merely as an example, Steelcase, a major client of CFT worth perhaps one million dollars of business a year to CFT in trucking services (I am, not sure of the amount), had sent an agreement for CFT to sign that was to extend into 2010. That agreement sat on my desk for quite a while, during that time I periodically reminded Goor to sign it, as it was worth a lot of money to the company. I was then unaware that he was going to close up CFT, but I found it strange that he would not sign it quickly, as he normally signed agreements like that upon

receipt, as it was important to CFT. As of when Goor closed our office, to my knowledge the agreement still had not been signed.

35. I believe that CFT-IOS entered into that very same agreement or relationship with Steelcase. I have to believe that CFT-IOS has done similarly with many of CFT's other large clients, including Kimball, Inscape, Knoll, Global Industries, Hudson Bay Environments, Bulo/D'Apostrophe, Tobron and others, which all told would have been worth millions of dollars yearly to CFT. I submit that this course of conduct is wrong. Steelcase and the other vendors were clients of CFT for many years, and Mrs. DiMaria would benefit from the revenues generated from such clients. It is outrageous that Goor and his son can take those relationships to CFT-IOS without CFT being compensated for same, so that Mrs. DiMaria could benefit from clients that her deceased husband had brought to CFT and serviced. I believe there are many other similar client relationships that Goor diverted to CFT-IOS and are now serviced by the same.

36. Lastly, for as long as I can remember, CFT did business in New York, and probably has done so since its establishment. As of when I was fired, CFT had many New York clients; New York vendors; New York creditors; and CFT's trucks went into New York almost daily. New York clients generated millions of dollars in revenues for CFT.

Sworn to before me this
28th day of January, 2010

_____
Notary Public

MATTHEW R. MARON
Notary Public, State of New York
No. 02MA6141948
Qualified in New York County
Commission Expires 03/06/2010

_____
MARIE KNEE