UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JEAN T. DIMARIA, Individually, and as Administratrix of the Estate of GARY DIMARIA, and Derivatively on behalf of CONTRACT FURNITURE TRANSPORT, INC., CONTRACT FURNITURE TRANSPORT ASSOCIATES, INC., CONTRACT FURNITURE WAREHOUSE CORP., CONTRACT FURNITURE PAINTING, LLC, CONTRACT FURNITURE INSTALLATIONS, LLC, DEPENDABLE MOVING AND STORAGE, INC., DEPENDABLE MOVING AND STORAGE CORP., SERVICE EAST, INC., and CONTRACT FURNITURE TRANSPORTATION, LLC,

Plaintiffs,

- against -

MARTIN GOOR, CFT-IOS, INC., RYAN GOOR, STEVEN MITNICK, ESQ., as Assignee for the Benefit of Creditors for CONTRACT FURNITURE TRANSPORT, INC. and CONTRACT FURNITURE TRANSPORT, ASSOCIATES, INC., CONTRACT FURNITURE TRANSPORT, INC., CONTRACT FURNITURE TRANSPORT ASSOCIATES, INC., CONTRACT FURNITURE WAREHOUSE CORP., CONTRACT FURNITURE PAINTING, LLC, CONTRACT FURNITURE INSTALLATIONS, LLC, DEPENDABLE MOVING AND STORAGE, INC., DEPENDABLE MOVING AND STORAGE CORP., SERVICE EAST, INC., and CONTRACT FURNITURE TRANSPORTATION, LLC,

Defendants.

---

1:09-cv-1011 (JG)

**AFFIDAVIT OF MARK VIGNOLES**

STATE OF CALIFORNIA    )
                       ) ss.:
COUNTY OF _____  )

Mark Vignoles, being duly sworn, deposes and says:

1. I am a former Defendant in my personal capacity in this action as well as the

principal of Service West, Inc. ("Service West"), also a former Defendant in this action.

2.   I submit this affidavit in opposition to the motion for partial summary judgment made by Defendants Contract Furniture Transport, Inc. ("CFT, Inc.") and Martin Goor (collectively, "Defendants") in the above captioned action. I make this affidavit based upon personal knowledge unless otherwise indicated. I originally met Gary DiMaria, the now deceased husband of Plaintiff in 2005, when my company, Service West Inc. was considering entering into a business venture with a company called "CFT". Over a period of several months, I had several discussions with Mr. DiMaria regarding a potential relationship between Service West and CFT. I was unaware at that time if CFT was a single entity or if there were several entities under the umbrella described by Di Maria as "CFT".

3.   In my communications with Mr. DiMaria, he never referred to any particular CFT entity by its full name. He simply referred to his business organization as "CFT". Mr. DiMaria did not limit the discussion to any one CFT entity. Had a business relationship with Mr. DiMaria come to fruition, any investment in or purchase of CFT by Service West would have included the entity or entities that make up the CFT umbrella.

4.   At some point in our conversations, Mr. DiMaria provided me with certain financial information that referenced an entity called Contract Furniture Transport Associates, Inc. ("CFT Associates"). I never received any documents from Mr. Di Maria that referenced CFT, Inc., nor did Mr. DiMaria make reference to CFT, Inc. I concluded my discussions with Mr. Di Maria in 2005. For reasons not disclosed to me, Mr. DiMaria elected not to continue the discussions with Service West. I did not ask for nor was I provided any documents reflecting agreements between any CFT entity and it shareholders or partners.

5.   After Mr. DiMaria passed away in 2005, I had my first discussion with Martin

2

Goor about CFT. It was my understanding that Mr. Goor and Mr. DiMaria had been co-owners of CFT, and Mr. Goor had indicated to me that the percentage of ownership was 50/50 between the two of them. At that time CFT needed a company to provide installation services that had once been provided by L & D Installers, and Service West was looking for an entrée into the New York metropolitan market. Service West needed access to the clients and good will of CFT in order to gain a foothold on the East Coast. Mr. Goor provided me with documents that disclosed that CFT and L & D had earned millions of dollars in revenue generated from a solid core of clients and customers. This pre-existing core of CFT clients provided the substantial platform from which Service West could initiate and operate its East Coast business.

6. In approximately September of 2006, Service West agreed to enter a lease for the warehouse located at 55 Hook Road in Bayonne New Jersey. Service West agreed to and did sublease a portion of the warehouse to CFT. CFT offered to pay rent in the amount of approximately $54,000, even though it was only occupying 50% of the floor space. Mr. Goor told me that the reason for this was to make it appear that its expenses were higher than they actually were because he didn't want to show net income because he would have to share that with Mrs. DiMaria.

7. I had hoped to develop a long term relationship with Mr. Goor and CFT. However, after two years of doing business with Mr. Goor and CFT, I came to learn that Mr. Goor could not be trusted, as CFT fell further and further in arrears on accounts and rents owed by CFT to Service West. Mr. Goor made multiple promises to pay what CFT owed to Service West, but reneged on all of them. Currently CFT owes Service West over $600,000.00. Service West and CFT are involved in litigation in New Jersey State Court concerning CFT's non-payment of these debts.

8. After Service West started doing business on a contract basis with CFT, I came to understand that there were other CFT entities operated by Mr. Goor. I was neither surprised nor concerned to find this out. It was my understanding that any future joint venture relationship between Service West and "CFT" meant all of the CFT entities under the umbrella of "CFT."

9. I conducted a further investigation of CFT's financial condition for the purpose of determining whether or not a permanent relationship between Service West and CFT could be achieved. The documents that Mr. Goor provided for my review were all CFT Associates financial records, not CFT financial records. Mr. Goor never advised me that the two entities were separate as he used them and referred to them interchangeably. For example the rent paid for the warehouse sublease by CFT was paid on CFT Associates checks.

10. During the two year period, Mr. Goor periodically provided me with spread sheets that contained financial information for several CFT companies, I'm not sure if all CFT companies were included in the reports provided by Mr. Goor.

11. The primary reason, indeed the only reason, that I considered entering into a relationship with CFT was to enjoy the benefit of the client base of CFT entity or entities. The client base of CFT was the single most important asset of CFT and when I considered a merger of CFT and Service West it was the good will of CFT represented by the clients of all CFT entities that constituted CFT's contribution to the joint venture.

12. I first became aware of a company called CFT-IOS in approximately November of 2009 after the negotiations between CFT and Service West over CFT's non-payment of accounts receivable and back rent broke down. I discovered that CFT was vacating the Service West warehouse and transferring its equipment, fixtures and inventory to a warehouse operated by Mr. Goor's son, Ryan Goor, under a company called CFT-IOS. It is my understanding that

all of the clients that CFT serviced from the Service West warehouse are now being serviced by CFT using the warehouse rented by CFT-IOS.

13.     Ryan Goor is a 22 year old young man who has never operated a company in the furniture transport business. I observed his on the CFT books as an employee expense. I am informed by my New Jersey warehouse superintendent, Tom Conroy, that Ryan Goor rarely if ever worked a full week. I have been in the furniture transport business and President of my own company for over 25 years. Based on my experience, there is no way a 22 year old with little or no management experience can operate a business the size of CFT without the oversight and direction from an experienced supervisor like his father, Martin Goor, behind the scenes running the company.

_____
MARK A. VIGNOLES

Sworn to before me this
\_th day of January, 2010

_____
Notary Public

301162597.1

5