UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
JEAN T. DIMARIA, Individually and as :
administratrix of the estate of GARY DIMARIA, :
and derivatively on behalf of CONTRACT :       MEMORANDUM
FURNITURE TRANSPORT, INC., CONTRACT :       AND ORDER
FURNITURE TRANSPORT ASSOCIATES, :
INC., CONTRACT FURNITURE WAREHOUSE :       09-CV-1011 (JG) (RML)
CORP., CONTRACT FURNITURE :
PAINTING, LLC, CONTRACT FURNITURE :
INSTALLATIONS, LLC, DEPENDABLE :
MOVING AND STORAGE, INC., :
DEPENDABLE MOVING AND STORAGE :
CORP., SERVICE EAST, INC., and :
CONTRACT FURNITURE :
TRANSPORTATION, LLC, :
:
       Plaintiffs, :
:
    - against - :
:
MARTIN GOOR, CFT-IOS, INC., :
RYAN GOOR, STEVEN MITNICK, ESQ., :
as Assignee for the Benefit of Creditors for :
CONTRACT FURNITURE TRANSPORT, INC. :
and CONTRACT FURNITURE TRANSPORT :
ASSOCIATES, INC.,  CONTRACT FURNITURE :
TRANSPORT, INC., CONTRACT FURNITURE :
TRANSPORT ASSOCIATES, INC., CONTRACT :
FURNITURE WAREHOUSE CORP., :
CONTRACT FURNITURE PAINTING, LLC, :
CONTRACT FURNITURE INSTALLATIONS, :
LLC, DEPENDABLE MOVING AND STORAGE, :
INC., DEPENDABLE MOVING AND STORAGE :
CORP., SERVICE EAST, INC., and CONTRACT :
FURNITURE TRANSPORTATION, LLC, :
:
       Defendants. :
:
------------------------------------------------------------ X

A P P E A R A N C E S:

GANFER & SHORE
360 Lexington Avenue,
New York, New York 10017
By:    Allen L. Finkelstein
       Mark A. Berman
       *Attorneys for Plaintiffs*

OLENDER FELDMAN LLP
       270 Lafayette Street, Suite 1510,
       New York, New York 10012
By:    Michael J. Feldman
       Kurt D. Olender
       *Attorneys for Defendants Martin Goor, Contract Furniture Transport, Inc.,*
       *and Contract Furniture Transport Associates, Inc.*

McNALLY & ASSOCIATES, LLC
       93 Main Street,
       Newton, New Jersey 07860
By:    Stephen B. McNally
                --&--
MICHAEL SHAPANKA, ESQ.
       150 West End Ave,
       Somerville, New Jersey 08876
       *Attorneys for Defendants CFT-IOS, Inc. and Ryan Goor*

NORRIS, McLAUGHLIN & MARCUS, PA
       875 Third Avenue, 8th Floor,
       New York, New York 10022
By:    Melissa A. Peña
       *Attorneys for Defendant Steven J. Mitnick*

JOHN GLEESON, United States District Judge:

This case involves a tangled web of corporations and claims.  Gary DiMaria and Martin Goor were partners in the business of moving and installing furniture.  Together, they owned various corporate entities, known for present purposes as the "CFT Entities," including Contract Furniture Transport, Inc. ("CFT, Inc.").  In 1992, they signed a Stockholders

Agreement in their capacities as shareholders in CFT, Inc., under which each was obligated to buy out the other's interest if the other died.

Gary DiMaria died in 2006, and his shares in the CFT Entities passed to his widow, Jean DiMaria. Relying on a course of dealing between her late husband and his partner, Jean DiMaria contends that Martin Goor is obligated under the Stockholders Agreement to buy her out of *all* the CFT Entities, not just CFT, Inc.

After the initial complaint was filed, Jean DiMaria amended her complaint to contend that, since her husband's death, Martin Goor has wrongfully stripped the CFT Entities of their assets and has unlawfully transferred those assets to a new corporation called CFT-IOS, Inc., whose President is Ryan Goor, Martin's son. The alleged wrongdoing includes the commencement of an assignment for the benefit of the creditors of CFT, Inc. and CFT Associates in New Jersey Superior Court. Jean DiMaria has now added various claims seeking damages against Martin Goor, the CFT Entities, Ryan Goor, and CFT-IOS. In addition, she purports to sue Steven J. Mitnick, an attorney who is serving as receiver of CFT, Inc. and CFT Associates in the New Jersey proceedings.

With the addition of the new claims and new parties, this litigation has become extremely complex. Several dispositive motions are now before me. First, Martin Goor, CFT, Inc., and Contract Furniture Transport Associates, Inc. ("CFT Associates") move for partial summary judgment, seeking to excise from the suit any claim to a buyout that extends beyond CFT, Inc. Defendants rely on the contract's plain language, which applies solely to CFT, Inc. As explained below, I agree that the Stockholders Agreement applies only to CFT, Inc., and grant partial summary judgment accordingly. However, I disagree with the defendants' construction of the Stockholders Agreement's price-determination mechanism.

Second, Martin Goor, CFT, Inc., CFT Associates, CFT-IOS, and Ryan Goor move to dismiss the complaint for failure to state a claim insofar as it asserts that those defendants are guilty of unlawfully diverting the CFT Entities' assets. For the reasons explained below, I agree that, for the most part, these claims are viable in this Court in their current form, and grant the motions to dismiss those claims in full, with the exception of Jean DiMaria's claim for repayment of a loan she allegedly made to the CFT Entities. In addition, I grant plaintiff leave to replead some of her claims.

Third, Mitnick, the assignee, moves to dismiss the complaint as against him, both for lack of personal jurisdiction and for failure to state a claim. A New Jersey resident, Mitnick argues that any suit may not properly be brought against him in a New York court. He also contends that the complaint states no claim as it pertains to him. As explained below, I grant the motion for failure to state a claim against Mitnick.

BACKGROUND

A.   *Martin Goor and Gary DiMaria*

Martin Goor and Gary DiMaria each owned 50% of CFT, Inc., a corporation that they used to carry on the business of delivering and installing furniture, mostly in New Jersey. However, it appears that, since the mid-1990s, CFT, Inc. was no more than a payroll company of little intrinsic value to its shareholders. At least since then, the business's assets were held, in part, by CFT Associates.

According to the complaint, Gary DiMaria and Martin Goor were also joint owners of the following entities: Contract Furniture Warehouse Corp., Contract Furniture Painting, LLC, Contract Furniture Installations, LLC, Dependable Moving And Storage, Inc.,

4

Dependable Moving And Storage Corp., Service East, Inc., and Contract Furniture Transportation, LLC.

B.     *The Stockholders Agreement*

On or about December 31, 1992, Gary DiMaria, Martin Goor, and CFT, Inc. entered into a "Stockholders Agreement."[1]  The agreement states on its first page that "the Corporation" is CFT, Inc.  Goor Cert., Ex A, at 1.  The avowed aim of the agreement was to ensure "the continuity of the Corporation's business" by providing procedures for sale and purchase of stock in "the Corporation" during DiMaria's and Goor's lifetimes.  *Id.*  It also provided procedures "to guard against the possibility that, upon the Stockholders' deaths, their estates might be required to sell such stock ownership in the Corporation to persons not familiar with the business."  *Id.*   According to Martin Goor, however, the real purpose of the Stockholders Agreement was to allocate life insurance proceeds in the event that one of the stockholders died.  The life insurance proceeds of the stockholder who died first were to be used by the survivor to buy out the decedent's interest.

Article 4 concerns the death of a stockholder.  It provides that, upon a stockholder's death, the Corporation has the option to purchase the decedent's stock from his estate.  If the corporation does not elect to do so within 30 days of the death, the Corporation is deemed to have elected not to exercise its purchase option.  Goor Cert., Ex A, at 8-9.   Under the Stockholders Agreement, if the Corporation does not choose to exercise its option, "the Surviving Shareholder shall then be obligated to purchase all of the Decedent's stock and the legal representatives of the Decedent's estate shall be obligated to sell to the Surviving

---

[1]     There was no similar Stockholders Agreement for any of the other CFT Entities.

Stockholder." *Id.* at 9. That sale is to take place on the terms set forth in the Agreement, including the "Death Purchase Price." *Id.* Article 4(a) states that the Death Purchase Price is to be agreed within 60 days of the decedent's death.

Article 4(c) provides that the survivor "shall receive proceeds of any insurance policies on the life of the Decedent listed in Exhibit A" to the Stockholders Agreement. Goor Cert, Ex. A, at 10. These proceeds "shall be payable to and used by … the Surviving Stockholder … to fund the purchase price in whole or in part for the Decedent's stock." *Id.* The agreement states that "[p]ayment for the Stock shall be deferred until the date of closing." *Id.* Article 4(d) concerns the closing, which is to take place no more than 60 days of the qualification of the decedent's legal representatives "provided that the insurance proceeds have been received by … the Surviving Stockholder." *Id.* If the life insurance proceeds arrive later, the closing is supposed to take place no later than 10 days from receipt. *Id.* at 11.

Article 6 addresses the determination of the Death Purchase Price. It states that the total value of the Corporation shall be "the last dated amount set forth on the Certificate of Agreed Value." Goor Cert, Ex. A, at 19. The first Certificate of Agreed Value was annexed as Exhibit B to the Stockholders Agreement, and it stated that the Corporation was worth $2 million.[2] Article 6 states that the Stockholders were supposed to meet at least once a year to determine the agreed value of the Corporation, but in fact they never executed another Certificate of Agreed Value. The agreement provides that, in the event that no revaluation takes place for more than two years, the value of the corporation is determined by taking the last agreed valuation and adding or subtracting the amount by which the net worth of the Corporation has

---

[2]       Martin Goor asserts that this figure was chosen because it was the value of life insurance that he and Gary DiMaria planned to obtain.

increased or decreased. That amount is to be calculated by "the certified public accountant regularly employed by the Corporation." *Id.* at 19-20.

C.    *Gary's Death and its Aftermath*

Gary DiMaria died on July 16, 2006. On his death, Jean DiMaria inherited his ownership interests in the CFT Entities. In addition, Jean DiMaria is the adminstratrix of her husband's estate.

Prior to Gary DiMaria's death, the CFT Entities were the subject of a criminal investigation concerning an alleged scheme to defraud a Carpenters' Union by falsifying records. The investigation ended in a settlement that was agreed to after Gary DiMaria's death. According to Jean DiMaria, she loaned $284,000 of her own money at Martin Goor's urging to the CFT Entities to help them to pay the settlement.

After Gary DiMaria died, Jean DiMaria invoked the Stockholders Agreement and demanded that Martin Goor buy her out of CFT, Inc. for $1 million. Martin Goor refused to pay anything, asserting that CFT, Inc. was simply a payroll company and was worthless.

D.    *The Initial Complaint in this Court*

Jean DiMaria, a New York resident, initially brought this action in the Supreme Court of Richmond County against Martin Goor, a New Jersey resident, and CFT, Inc., a New Jersey corporation that does its business largely in the Garden State.[3] Among other things, the complaint asserted that Martin Goor breached a contractual obligation to buy Jean DiMaria out of all the CFT Entities, not just CFT, Inc.

---

[3]    The initial complaint also named as defendants Mark Vignoles and Service West, Inc. The amended complaint omits these defendants, and I approved plaintiffs' voluntary dismissal of the action as it pertains to them.

The defendants removed the action to federal court pursuant to diversity jurisdiction. On December 3, 2009, Martin Goor moved for partial summary judgment on the breach of contract claim.

E.      *The CFT Entities' Receivership and the Creation of CFT-IOS*

On November 17, 2009, CFT, Inc. and CFT Associates entered into an assignment for the benefit of creditors, or "ABC proceeding," under New Jersey law. Stephen Mitnick was appointed receiver by the court. Pursuant to those proceedings, the assets of CFT, Inc. and CFT Associates were transferred to CFT-IOS, a new company of which Ryan Goor, Martin Goor's son, was the President. Jean DiMaria contends that the ABC proceedings were undertaken for the purpose of precluding her from exercising her rights to her late husband's shareholdings.

F.      *The Amended Complaint*

On December 4, 2009, Jean DiMaria moved to amend the complaint to incorporate allegations and claims relating to Ryan Goor, CFT-IOS, and the receivership of CFT, Inc. and CFT Associates. I granted leave to file the amended complaint, which purports to state nine causes of action and names as defendants Martin Goor, all the CFT Entities, Ryan Goor, CFT-IOS and Mitnick.

Count One asserts a cause of action for breach of contract, by Jean DiMaria and her husband's estate against Martin Goor. Am. Compl. ¶¶ 58-67. Jean DiMaria asserts that the Stockholders Agreement applies to all the CFT Entities, and that Martin Goor has breached the Agreement by refusing to buy her out of any of the Entities.

Count Two is a claim for breach of fiduciary duty by Jean DiMaria and the estate against Martin Goor. Am. Compl. ¶¶ 68-77. The complaint states that as a shareholder, officer,

8

and director of the CFT Entities, Martin Goor owed a fiduciary duty to Gary DiMaria and, after Gary's death, to his widow. Martin Goor breached that duty, according to the complaint, by diverting the CFT Entities' business to his son and CFT-IOS. Jean DiMaria asserts that she suffered loss as a result of Martin Goor's breach of duty, and seeks compensatory damages.

Count Three purports to state a derivative claim against Martin Goor by Jean DiMaria on behalf of the CFT Entities for breach of fiduciary duty. Am. Compl. ¶¶ 78-85. The allegations of wrongdoing supporting Count Three are essentially the same as those in Count Two, but Count Three seeks to compensate the CFT Entities, rather than Jean DiMaria and the estate, for the losses the CFT Entities have suffered. The complaint also asserts that Martin Goor should disgorge to the CFT Entities any payments he received from the Entities themselves or from CFT-IOS after November 3, 2009.

Count Four is a derivative claim by Jean DiMaria on behalf of the CFT Entities against Martin Goor for corporate waste. Am. Compl. ¶¶ 86-89. Here, the complaint asserts that Martin Goor committed waste by diverting business to CFT-IOS, by failing to advertise the CFT Entities' furniture storage and installation services, by allowing the CFT Entities to go out of business, and by directing employees of the CFT Entities to perform work for CFT-IOS.

Count Five relates to the December 2007 loan. It asserts a claim by Jean DiMaria, solely in her individual capacity, for unjust enrichment against the Martin Goor and the CFT Entities. Am. Compl. ¶¶ 90-94. Jean DiMaria states she loaned the money to Martin Goor and the CFT Entities, and that Martin Goor told her that the money would be repaid to her from the CFT Entities' accounts receivable and from the accounts receivable of L&D Installers, another of the related companies, but that she has never been repaid.

Count Six asserts a claim by Jean DiMaria and her husband's estate sounding in conspiracy.  Am. Compl. ¶¶ 95-101.  The claim is asserted against Martin Goor and Ryan Goor, who are alleged to have conspired to commit unlawful acts diverting business away from the CFT Entities and towards CFT-IOS.  Count Seven is another conspiracy claim, similar to Count Six except that it is a derivative claim brought by Jean DiMaria on behalf of the CFT Entities. Am. Compl. ¶¶ 102-08.  Again, the defendants are Martin Goor and Ryan Goor.

Count Eight asserts a claim by Jean DiMaria and the estate against Ryan Goor and CFT-IOS for aiding and abetting Martin Goor's breach of fiduciary duty.  Am. Compl. ¶¶ 109-14.  Count Nine is also a claim against Ryan Goor for aiding and abetting breach of fiduciary duty, but it is a derivative claim by Jean DiMaria on behalf of the CFT Entities.  Am. Compl. ¶¶ 115-20.

G.      *The Motions Before the Court*

In addition to Martin Goor's motion for partial summary judgment on the breach of contract claim, the amended complaint was met with various motions to dismiss.  Martin Goor, CFT, Inc., CFT Associates, Ryan Goor and CFT-IOS move to dismiss all the remaining claims for failure to state a claim.  Mitnick moves to dismiss for lack of personal jurisdiction and also contends that the complaint states no claim against him.

DISCUSSION

A.      *The Breach of Contract Claim*

Defendant Martin Goor moves for partial summary judgment on the breach of contract claim, Count One.  That claim is based on the Stockholders Agreement, and asserts that Martin Goor must buy Jean DiMaria out of *all* the CFT Entities.  Martin Goor accepts that he is obligated to buy out Jean DiMaria's interest in CFT, Inc., but asks the court to limit that

obligation to CFT, Inc. alone. He also seeks judgment declaring that the purchase price for the buyout is 50% of the value of CFT, Inc. as of June 2006, as determined by CFT, Inc.'s accountants.

1. *The Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also, e.g., Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

The moving party must demonstrate that no genuine issue exists as to any material fact. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). A fact is "material" under Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995).

Once the moving party has met its burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24.

2.      *The Scope of the Buyout Obligation*

Under New Jersey law – which the parties agree governs the agreement's interpretation[4] – contracts are given their "plain and ordinary meaning." *E. Brunswick Sewerage Auth. v. E. Mill Assocs., Inc.*, 365 N.J. Super. 120, 125 (App. Div. 2004). "When the terms of a contract are clear, the court must enforce them as written." *Id.*

Martin Goor contends that I should look solely to the Stockholders Agreement's text and limit his buyout obligation to CFT, Inc. Jean DiMaria asks me to read this text in a broader context. She contends that, in reality, CFT, Inc. and the other CFT Entities were "inextricably intertwined," that their assets were commingled, and that they operated as each others' alter egos.

Whether the CFT Entities operated as each others' alter egos does not affect the interpretation of the agreement. A court may look to the context surrounding a contract where its terms are ambiguous. *See Chance v. McCann*, 405 N.J. Super. 547, 564 (App. Div. 2009). But there is simply no ambiguity as to whether the Stockholders Agreement applies beyond CFT, Inc. On its face, the Stockholders Agreement applies to CFT, Inc. and to CFT, Inc. alone. CFT, Inc. itself was named as a party to the agreement; none of the other CFT Entities was a party. On the contract's first page, the term "Corporation" was defined to mean "CFT, Inc.," and all the subsequent terms of the agreement refer solely to "the Corporation."

---

[4]      The Stockholders Agreement states that New Jersey law governs the interpretation of the contract. *See* Stockholders Agreement Art. 16(h). Under New York's rules, which govern the choice-of-law questions in diversity actions in this Court, *see Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 498 (1941), a contractual choice-of-law provision is generally binding on a party claiming rights under the contract. *See, e.g., Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd*., 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.").

The plaintiff contends that a reasonable jury might "pierce the corporate veil" of CFT, Inc. and thereby apply the buyout obligation beyond that entity. But veil-piercing analysis is undertaken to protect third parties from deceptive abuses of the corporate form. *See Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002) (under New Jersey law, "the purpose of *alter ego* liability and piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law" (internal quotation marks omitted)). That kind of analysis is inapposite in a dispute over the obligations created by a contract between two corporate insiders.

In addition, I reject Jean DiMaria's argument that she should be given the opportunity to request further discovery from the defendants before I conclude that the Stockholders Agreement applies only to CFT, Inc. *See* Fed. R. Civ. P. 56(f) ("If a party opposing [a summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order."). An award of summary judgment would indeed be premature if Jean DiMaria could point to possible relevant evidence she might uncover in further discovery, but the deficiency of her claim that the buyout obligation sweeps beyond CFT, Inc. is more fundamental than that. Even assuming that Jean DiMaria can uncover more evidence that the CFT Entities' affairs were intermingled, her claim to be bought out of the other companies would fail as a matter of law, and thus further discovery on that issue would be futile. *See, e.g, Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir. 1994) (a litigant seeking further discovery must show that the material sought is germane to the case).

For these reasons, Martin Goor's motion for partial summary judgment is granted to the extent that the buyout obligation contained in the Stockholders Agreement applies solely to CFT, Inc.

3.      *The Price-Determination Mechanism*

Martin Goor also seeks summary judgment on the breach of contract claim in the form of a declaration that the purchase price for Jean DiMaria's interest in CFT, Inc. is zero.

As outlined above, Article 6 of the Stockholders Agreement sets forth a mechanism for determining the "Death Purchase Price" where, as here, the parties to the agreement fail to agree on the corporation's value for more than two years.   In these circumstances, the value of the corporation is determined by taking the last agreed valuation – in this case, $2 million – and adding or subtracting the amount by which the net worth of the Corporation has increased or decreased since the last valuation.  That amount is to be calculated by CFT, Inc's certified public accountant.

Martin Goor states that CFT, Inc.'s accountant will testify that, as of June 2006, CFT, Inc. had no value because it was simply a payroll company.  From this premise, Martin Goor contends that he is not obligated to pay anything to Jean DiMaria for her shareholding in the corporation.  Jean DiMaria contends that, for the net worth to be determined, a forensic accounting is required so that the effect of Martin Goor's diversions, misappropriations, corporate waste, and commingling of funds can be taken into account.

Regardless of Martin Goor's conduct as a director of CFT, Inc., his argument with respect to the Death Purchase Price is flawed.  Under the agreement, the Death Purchase Price is not calculated by taking the accountant's valuation of the corporation and dividing it in half.  Rather, the accountant is required to determine the extent by which CFT, Inc.'s value has

14

declined since the last agreed valuation in 1992. That amount is then subtracted from the amount of the last agreed valuation. If the extent of the decline in CFT, Inc.'s value is less than $2 million, the Death Purchase Price would be more than zero. There is no indication before the Court of the accountant's valuation of the extent of the decline. As the party seeking summary judgment, Martin Goor bears the risk of nonpersuasion on this issue.

Accordingly, to the extent that he seeks a declaration that the purchase price is zero, Martin Goor's motion for summary judgment is denied.

B.      *The Diversion and Waste Claims*

Though they assert varying legal the theories, Counts Two, Three, Four, Six, Seven, Eight, and Nine all allege that the defendants are liable for participating in diverting the CFT Entities' assets and for mismanaging the Entities' affairs. Some of these claims – Counts Two, Six, and Eight – are direct claims by Jean DiMaria, while the rest – Three, Four, Seven, and Nine – are styled as derivative claims brought by Jean DiMaria on behalf of the entities of which she is a shareholder.

For the reasons stated below, I conclude that these seven claims must be dismissed for failure to state a claim upon which relief may be granted. In short, the direct claims are dismissed because they allege harms to the CFT Entities, rather than to the plaintiff herself. The derivative claims brought on behalf of CFT, Inc. and CFT Associates fail because the proper place to raise them is in the New Jersey court proceedings. The purported derivative claims on behalf of the remaining CFT Entities are dismissed because the complaint fails to specify how these Entities have been harmed by the defendants' conduct. However, I grant leave to replead the derivative claims on behalf of the CFT Entities apart from CFT, Inc. and CFT Associates.

1. *The Plaintiff's Direct Claims for Diversion and Corporate Waste*

Counts Two, Six, and Eight all suffer from a common failing: they purport to be claims by a shareholder asserting a harm done to the corporation. A corporation is an entity distinct from its shareholders, and New Jersey law embraces the general principle that "[r]egard for the corporate personality demands that suits to redress corporate injuries which secondarily harm all shareholders alike are brought only by the corporation." *Strasenburgh v. Straubmuller*, 146 N.J. 527, 549 (1996) (internal quotation marks omitted). The policy reasons for restricting individual actions by shareholders include "maintaining the investment resources of the corporation, avoiding a multiplicity of suits, providing equal benefit for all shareholders and avoiding partial dividends or partial liquidation." *Id.* "When an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively in behalf of the corporation." *Id.* (internal quotation marks omitted).

Counts Two, Six and Eight cannot be brought as direct claims against Martin Goor because each relates to his purported service as an officer or director of the CFT Entities that Jean DiMaria alleges reduced the value of her shares in the Entities. Under New Jersey law, each of these claims is derivative as a matter of law. "Shareholders cannot sue individually for a diminution in the value of their shares." *Hague v. Rica*, 2008 WL 2329897, at *3 (N.J. App. Div. June 9, 2009). Thus, none of the direct claims states a claim upon which relief may be granted, unless the allegations in the complaint bring Jean DiMaria within an exception to the general rule that a shareholder cannot bring a direct claim for injury to the corporation by its officers or directors.

New Jersey law does recognize exceptions to the general rule, and Jean DiMaria seeks to bring herself within one of these exceptions by asserting that she suffered a "special injury" separate and apart from the injury suffered by the corporation. *See Strasenburgh*, 146 N.J. at 549. The complaint, however, does not allege any distinct injury to Jean DiMaria. The injuries alleged in Counts Two, Six and Eight are simply that Martin Goor depleted the corporations' assets.

For those reasons, Counts Two, Six, and Eight are dismissed for failure to state a claim on which relief may be granted.

2. *The Plaintiff's Derivative Claims for Diversion of Assets and Corporate Waste*

Counts Three, Four, Seven, and Nine all purport to state derivative claims on behalf of the CFT Entities. Jean DiMaria purports to bring these four derivative claims on behalf of all the CFT Entities. It is necessary, however, to distinguish between claims brought on behalf of the entities subject to the ABC proceedings – CFT Inc. and CFT Associates – and the remaining CFT Entities.

a. *The Derivative Claims on Behalf of CFT, Inc. and CFT Associates*

Understanding the effect of the assignment of claims brought on behalf of CFT, Inc. and CFT Associates necessitates a brief explanation of the ABC proceedings, which are governed by a New Jersey statute. *See* N.J.S.A. 2A:19-1 to 19-50. The statute provides for an assignee to preside over the marshaling of a debtor's assets for distribution to creditors. *See id.* 2A:19-1. The debtor is allowed to choose the assignee, but the assignee must act as a fiduciary to creditors, and is charged with maximizing the funds to be distributed to creditors in equal fashion. *See id.* 19-1 & 19-14. Unlike a federal bankruptcy filing, the commencement of ABC proceedings does not create an automatic stay of proceedings against the debtor. *Cf.* 11 U.S.C. §

362.  Nevertheless, the role and responsibilities of the assignee are "not unlike [those of] the trustee in a Chapter 7 proceeding."  *In Re Short Hills Caterers, Inc.*, 08-18604 DHS, 2008 WL 2357860, at *5 (Bankr. D.N.J. June 4, 2008).  "There is nothing manipulative or improper about an assignment for the benefit of creditors."  *Id.*

The assignee in an ABC proceeding has "as full power and authority to dispose of all of the assignor's property … as the assignor had at the time of the general assignment."  N.J. Stat. Ann. § 2A:19-13.  The assignee "may sue for and recover in his own name everything belonging or appertaining to the estate,"  "may compromise, settle and compound all claims, disputes and litigations of the assignor," and may "generally act as and do whatsoever the assignor might have lawfully done in the premises."  *Id.*

ABC proceedings are supervised by the New Jersey Superior Court.  The assignee is required in all cases to file an inventory and valuation of the debtor's assets with the Clerk of the Superior Court.  N.J.S.A. 2A:19-9.  The court may authorize the assignee to continue the assignor's business for a period of time.  *Id.* § 2A:19-16.   The assignee is required to submit all contracts for sale of the assignor's property to the court for confirmation. *Id.* § 2A:19-19.

The statute gives creditors a period within which to submit their claims to the assignee; at the conclusion of that period, the assignee is required to submit to the Superior Court a list of creditors who have proved their claims.  *Id.* § 2A:19-25.  Within sixty days, any interested party "may file in the court exceptions to the allowance or rejection by the assignee of claim or demand of any creditor ... . The court may then adjudicate upon such claim or demand."  *Id.* § 2A:19-29.  After the creditors' claims are adjudicated, the assignee conducts a court-supervised distribution of the assignor's assets to the creditors.  The assignee may be removed by the Superior Court if the assignee is guilty of "neglect" or if he "refuse[s] to execute his trust. "

*Id.* § 2A:19-37.  At the conclusion of the ABC proceedings, the assignee renders, under oath, a final account to the court.  *Id.* § 2A:19-41.

The effect of the ABC proceedings was to transfer to the assignee all of CFT, Inc.'s and CFT Associates' assets, including any claims against Martin Goor, Ryan Goor, and CFT-IOS.  To the extent that Counts Three, Four, Seven, and Nine assert derivative claims on behalf of CFT, Inc. and CFT Associates, these claims are now in the assignee's hands.  In New Jersey, as elsewhere, "[a] shareholder derivative action is a unique and anomalous legal remedy." *See Strasenburgh*, 146 N.J. at 548.  "The purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 548 (1949)).  Under New Jersey law, Jean DiMaria lacks standing to bring claims that belong to the assignee.   Now that the claims are controlled by the assignee, a derivative action – an extraordinary remedy designed to protect the corporation from dissolute directors and managers – would be inappropriate.

Jean DiMaria is not left powerless by this state of affairs.  As explained above, she has the right to challenge, in New Jersey Superior Court, the way the assignee carries out his duties.  Jean DiMaria has availed herself of the opportunity to invoke judicial supervision of the assignment.  Prior to oral argument on these motions, Jean DiMaria moved in New Jersey Superior Court to set aside the assignment.   The New Jersey Superior Court has since denied that motion.[5]

---

[5]     None of the defendants has sought to assert that the New Jersey court's decision has preclusive effect on this action.

Even if, under New Jersey law, a derivative claim on behalf of CFT, Inc. or CFT Associates was appropriate, I would abstain from exercising jurisdiction over any such claim. The federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given them by Congress, even where the parties are also litigating the same issue in state-court proceedings. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). But the federal courts have developed exceptions to this rule, and one of these exceptions permits district judges to avoid duplicative parallel proceedings under the doctrine known as "*Colorado River* abstention." The boundaries of the doctrine are far from clear, but it rests on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Id.* at 817, quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952).

To determine whether abstention under *Colorado River* is appropriate, a district court is required to weigh six factors, "with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16 (1983); *see also Village of Westfield v. Welch's*, 170 F.3d at 121. These six factors are:

> (1) the assumption of jurisdiction by either court over any *res* or property;
>
> (2) the inconvenience of the federal forum;
>
> (3) the avoidance of piecemeal litigation;
>
> (4) the order in which jurisdiction was obtained;
>
> (5) whether state or federal law supplies the rule of decision; and
>
> (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

No single factor is necessarily decisive, *see De Cisneros v. Younger,* 871 F.2d 305, 307 (2d Cir. 1989), and the "weight to be given to any one factor may vary greatly from case to case,

depending on the particular setting of the case." *Moses H. Cone*, 460 U.S. at 16. On appeal, the

decision whether or not to abstain is reviewed only for abuse of discretion. Accordingly, the

Second Circuit requires district courts to analyze each of the six factors. *See Village of*

*Westfield*, 171 F.3d at 121; *Burnett v. Physician's Online, Inc.*, 99 F.3d 72, 77 (2d Cir. 1996)

(remanding for further proceedings because the district court had not explicitly considered each

of the factors). I consider each of the factors in turn.

(i) The Assumption of Jurisdiction By Either Court over Any *Res* or Property: At

the commencement of the ABC proceedings, the New Jersey court assumed jurisdiction over the

assets of CFT, Inc. and CFT Associates. This first factor therefore favors abstention.

(ii) The Inconvenience of the Federal Forum: The action involves a plaintiff from

Staten Island and defendants from New Jersey. Each party has hired attorneys from their own

locations. All parties must travel eastwards to Brooklyn for court appearances in this district; the

New Jersey forum is more convenient for the New Jersey attorneys. Moreover, since CFT, Inc.

and CFT Associates mostly did business in New Jersey, relevant witnesses are more likely to be

in New Jersey. The federal forum is marginally less convenient than the state forum. The

second factor thus weighs in favor of abstention, but only slightly.

(iii) The Avoidance of Piecemeal Litigation: The ABC proceedings and the

corporate waste and diversion claims on behalf of CFT, Inc. and CFT Associates concern the

same subject-matter; indeed, the diversion claims seek to attack the validity of the assignment

that is being supervised by the New Jersey courts. Allowing both actions to proceed would

therefore lead to duplicative and piecemeal litigation, and this factor thus favors abstention.

(iv) The Order in which Jurisdiction was Obtained: Though Jean DiMaria's

federal-court action was filed first, the claims at issue here were included only in the amended

complaint.  The amended complaint was filed after the ABC proceedings were commenced.  The fourth factor therefore favors abstention.

(v) Whether State or Federal Law Supplies the Rule of Decision: Where federal law supplies the rule of decision, abstention is disfavored because it involves abdicating jurisdiction over a matter of federal interest.  This case, however, turns solely on issues of New Jersey law.  Accordingly, the fifth factor weighs in favor of abstention.

(vi) Whether the State Court Proceeding Will Adequately Protect the Rights of the Party Seeking to Invoke Federal Jurisdiction:  The ABC proceedings will adequately protect Jean DiMaria's rights to challenge the way the affairs of these related companies have been conducted.  Those proceedings place the corporations' claims in the hands of an assignee, who is obligated to act as a fiduciary for the debtors' creditors, and whose activities are supervised by the New Jersey Superior Court.   Thus, the sixth factor also favors abstention in favor of the New Jersey Superior Court.

Conclusion on the *Colorado River* Abstention Factors:  Considerations of wise judicial administration counsel strongly in favor of having CFT Inc.'s and CFT Associates' claims, if any, adjudicated in New Jersey state court.   Abstaining in favor of the New Jersey proceedings would serve an important countervailing interest, and I conclude that there is a sufficiently clear justification for abstention that dismissal of the diversion and waste claims is appropriate.

Counts Three, Four, Six, and Nine are therefore dismissed for failure to state a claim to the extent that the plaintiff seeks to assert these claims on behalf of CFT, Inc. and CFT Associates.

b.    *The Derivative Claims on Behalf of the Other CFT Entities*

Both sides of this complex dispute have focused on the effect of the ABC proceedings on derivative claims brought on behalf of the debtors, CFT, Inc. and CFT Associates.  But the remaining CFT Entities – Contract Furniture Warehouse Corp., Contract Furniture Painting, LLC, Contract Furniture Installations, LLC, Dependable Moving And Storage, Inc., Dependable Moving And Storage Corp., Service East, Inc., and Contract Furniture Transportation, LLC – are not the subject of the ABC proceedings, and those proceedings do not affect Jean DiMaria's attempts to bring derivative claims on their behalf.

The current state of the complaint does not permit me to determine how much, if any, of these claims survive the motion to dismiss.  Counts Three, Four, Seven, and Nine are asserted on behalf of all the CFT Entities without distinguishing between them.  Now that I have dismissed the claims against CFT, Inc. and CFT Associates, it is all the more necessary to determine precisely what conduct the defendants are being sued for.  The amended complaint is deficient in that it fails to specify how each of the CFT Entities was harmed by the defendants' conduct.  Accordingly, I conclude that the proper course is to grant the motion to dismiss Counts Three, Four, Seven and Nine, but grant the plaintiff leave to replead these Counts as against Contract Furniture Warehouse Corp., Contract Furniture Painting, LLC, Contract Furniture Installations, LLC, Dependable Moving And Storage, Inc., Dependable Moving And Storage Corp., Service East, Inc., and Contract Furniture Transportation, LLC.  In the event that the plaintiff continues to assert claims against the remaining defendants, the defendants remain free to challenge the appropriateness of bringing derivative claims in these circumstances.

C.     *The Loan Claim*

In addition to the corporate waste and diversion claims, Jean DiMaria also claims that she loaned $284,000 to the CFT Entities and to Martin Goor so that the Entities could settle their legal dispute with the employees' union.  She sues the CFT Entities and Martin Goor for repayment of the loan in Count Five of the complaint.  Though the defendants contend that the New Jersey Superior Court is the proper forum for this claim, the claim differs from the corporate waste and diversion claims considered above in that Jean DiMaria brings the loan claim in her personal capacity, rather than in her capacity as a shareholder in the CFT Entities.  Though their effect may be to limit Jean DiMaria's recovery on the loan claim as against CFT, Inc. and CFT Associates, the ABC proceedings do not provide a reason to abstain from adjudicating that claim.

The defendants argue that the complaint does not plead the terms of the loan with sufficient particularity.  As regards the CFT Entities, I reject that contention. The claim is pled with sufficient particularity; the plaintiff asserts that she made the loan to the CFT Entities and that the loan has not been repaid.  Nothing more is required at the Rule 12(b)(6) stage to state a claim for recovery of the loan.

As against Martin Goor, however, the loan claim is not sufficiently pled.  The complaint alleges that the monies were paid to the CFT Entities.  There is no allegation that monies were paid to Martin Goor in his personal capacity or that he guaranteed the loan.  As currently drafted, the complaint contains no legal basis for holding Martin Goor personally answerable on the loan. In the circumstances, however, I conclude that is appropriate to grant

Jean DiMaria an opportunity to specify the facts, if any, that would make Martin Goor liable to repay the money.[6]

Accordingly, the motion to dismiss Count Five is denied as it pertains to the CFT Entities, and granted with leave to replead as against Martin Goor.

D.    *Mitnick's Motions to Dismiss*

Mitnick moves to dismiss the action on various grounds. He contends that this court lacks personal jurisdiction over him, and that it should in any event abstain from exercising any jurisdiction over any claims relating to the ABC proceedings.

I need not determine whether Mitnick has sufficient contacts with New York to warrant the exercise of personal jurisdiction, because he identifies a more fundamental problem with the complaint's allegations against him: Though Mitnick is named as a defendant in the caption and mentioned in the complaint's factual recitation, none of the nine listed causes of action purports to state a claim against him. That alone is sufficient to require me to dismiss the action as it pertains to him.[7]

CONCLUSION

For the reasons stated above, Martin Goor's motion for partial summary judgment is granted in part and denied in part; the motions to dismiss by Martin Goor, CFT Inc., CFT

---

[6]    Contending that he is not liable on the loan, Martin Goor points to a letter written by Jean DiMaria's lawyer stating that she loaned the money to the CFT Entities. Though this letter may be evidence that Martin Goor is not personally liable on the loan, it is far from conclusive at the pleadings stage.

[7]    Leave to amend the complaint as against Mitnick is denied as futile because, at oral argument, the plaintiff identified no claim she might bring against him. In any event, I would abstain from adjudicating any cause of action against Mitnick for essentially the same reasons I abstain from exercising jurisdiction over the derivative corporate waste and diversion claims purportedly brought on behalf of CFT, Inc. and CFT Associates. *See, e.g., Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (affirming denial of leave to amend complaint on the ground that amendment would not affect the court's decision).

Associates, Ryan Goor, and CFT-IOS are granted in part and denied in part; and Mitnick's motion to dismiss is granted in full.

The claims that survive this round of dispositive motions are (a) Count One, solely as it relates to CFT, Inc.; and (b) Count Five, as it asserts claims against the CFT Entities. In addition, the plaintiff is granted leave to replead (a) Counts Three, Four, Seven and Nine, insofar as they assert claims on behalf of CFT Entities other than CFT Inc. and CFT Associates; and (b) Count Five, as it pertains to Martin Goor.

If the plaintiff chooses to file a second amended complaint in response to this ruling, she shall do so on or before October 29, 2010.

So ordered.

John Gleeson, U.S.D.J.

Dated:      September 30, 2010
            Brooklyn, New York