UNITED STATES DISTRICT COURT　　　　　ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

---

JEAN T. DIMARIA, individually and as
administratrix of the Estate of GARY
DIMARIA,

                          Plaintiff,

          - versus -

MARTIN GOOR, CONTRACT FURNITURE
TRANSPORT, INC., CONTRACT
FURNITURE TRANSPORT ASSOCIATES,
INC., CONTRACT FURNITURE
WAREHOUSE CORP., CONTRACT
FURNITURE PAINTING, LLC, CONTRACT
FURNITURE INSTALLATIONS, LLC,
DEPENDABLE MOVING AND STORAGE,
INC., DEPENDABLE MOVING AND
STORAGE CORP., and CONTRACT
FURNITURE TRANSPORTATION, LLC,

                        Defendants.*

MEMORANDUM
AND ORDER
09-CV-1011 (JG) (RML)

A P P E A R A N C E S:

    EPSTEIN & CRESCI
        7 Dey St., 11th Floor
        New York, New York 10007
    By:   Timothy Charles Walsh
        *Attorney for Plaintiff*

    OLENDER FELDMAN LLP
        2840 Morris Avenue
        Union, New Jersey 07041
    By:   Michael J. Feldman
        *Attorney for Defendant Martin Goor*

JOHN GLEESON, United States District Judge:

---

    *    I have amended the case caption to reflect the most recent pleadings and orders in the case.

This is the third time I have been presented with dispositive motions in this case. In my previous memoranda and orders, *DiMaria v. Goor*, No. 09-CV-1011(JG)(RML), 2010 WL 3923227 (E.D.N.Y. Sept. 30, 2010) (ECF No. 73), and *DiMaria v. Goor*, No. 09-CV-1011(JG)(RML), 2011 WL 3235754 (E.D.N.Y. July 28, 2011) (ECF No. 90), I significantly winnowed down the claims and the parties in the case. Only one claim now remains against moving defendant Martin Goor ("Goor"):[1] Plaintiff Jean DiMaria ("DiMaria) seeks to enforce Goor's performance of a Stockholders Agreement between Goor and DiMaria's deceased husband under which each was obligated to buy out the other's interest if the other died. Goor has filed a motion for summary judgment in which he does not dispute liability under this contract, but seeks a determination that the price he must pay for the stock is zero. For the reasons explained below, I deny Goor's motion.

## BACKGROUND

The full facts of this case are set forth in my previous opinions, and familiarity with them is assumed. I recite in this memorandum and order only those facts necessary to dispose of the present motion.

A. *Martin Goor, Gary DiMaria and CFT, Inc.*

Goor and Gary DiMaria ("Mr. DiMaria") each owned 50% of Contract Furniture Transport, Inc. ("CFT, Inc." or the "corporation"), a corporation that they used to carry on the business of delivering and installing furniture, mostly in New Jersey. Mr. DiMaria and Goor were also joint owners of a number of other corporate entities related to the same business, collectively referred to as the "CFT Entities."[2]

---

[1] DiMaria's only other remaining cause of action asserts a claim for unjust enrichment against the CFT Entities. This claim is not at issue in the instant summary judgment motion.

[2] The "CFT Entities" as referred to in this memorandum and order include Contract Furniture Transport, Inc., Contract Furniture Transport Associates, Inc., Contract Furniture Warehouse Corp., Contract

2

B.  *The Stockholders Agreement*

On or about December 31, 1992, Mr. DiMaria and Goor entered into a "Stockholders Agreement," in their capacities as 50% shareholders in CFT, Inc.[3] Stockholders Agreement at 1, Goor Cert., Ex. A (ECF No. 92-4). The Agreement's stated purpose was to ensure "the continuity of the Corporation's business" by providing procedures for the sale and purchase of stock in CFT, Inc., both during Mr. DiMaria's and Goor's lifetimes and upon their deaths. *Id.* The procedures for sale upon death of a stockholder were provided "to guard against the possibility that, upon the Stockholders' deaths, their estates might be required to sell such stock ownership in the Corporation to persons not familiar with the business." *Id.*

Article 4 of the Stockholders Agreement concerns the death of a stockholder. *Id.* at 8. It provides that, upon the death of either stockholder, the corporation has the option to purchase all of the decedent's stock from his estate. If, however, CFT, Inc. does not elect to exercise its purchase option, "the Surviving Shareholder shall then be obligated to purchase all of the Decedent's stock and the legal representatives of the Decedent's estate shall be obligated to sell to the Surviving Stockholder, at the Death Purchase Price." *Id.* at 9.

Article 6 addresses the determination of the Death Purchase Price. It provides that the price per share shall be determined by dividing the number of outstanding shares into the corporation's "Value," which is defined as "the total value of" CFT, Inc. *Id.* at 19-20. This Value is determined in one of two ways. If Goor and Mr. Dimaria had agreed on the corporation's value in a Certificate of Agreed Value within the last two years, then the corporation's Value shall be "the last dated amount set forth on the Certificate of Agreed Value."

---

Furniture Painting, LLC, Contract Furniture Installations, LLC, Dependable Moving and Storage, Inc., Dependable Moving and Storage Corp, and Contract Furniture Transportation, LLC.

[3] CFT, Inc. was also a party to the agreement. There was no similar agreement for any of the other CFT Entities.

3

*Id.* at 19.

If, instead, Goor and Dimaria had failed to agree on a valuation of the corporation for more than two years, then the Value "shall . . . be determined by using the amount set forth on the most recent Certificate of Agreed Value, plus (or minus) an amount which reflects the increase (or decrease) in the net worth of the corporation from the date of the most recent Certificate of Agreed Value to the end of the month immediately preceding the . . . Decedent's death . . . , as determined by the certified public accountant regularly employed by the Corporation, applying generally accepted accounting principles." *Id.* at 19-20. At the time of their execution of the Stockholders Agreement, Mr. DiMaria and Goor "determined the Value of the Corporation" to be $2 million, which they set forth in a Certificate of Agreed Value dated December 31, 1992. *Id.* at 20, Ex. B. DiMaria and Goor never again agreed on the corporation's value in a Certificate of Agreed Value after that date.

C. *Mr. DiMaria's Death and Its Aftermath*

Mr. DiMaria died on July 16, 2006. Upon his death, Jean DiMaria inherited his ownership interests in the CFT Entities, including CFT, Inc. DiMaria then invoked the Stockholders Agreement and demanded that Goor buy her out of CFT, Inc. for $1 million (half of the last-agreed value of $2 million). Goor refused to pay anything, asserting that CFT, Inc. was simply a payroll company and was worthless.

D. *Procedural History*

DiMaria commenced this action in the Supreme Court of Richmond County, New York, on February 6, 2009, on behalf of herself, as administratrix of her husband's estate, and derivatively on behalf of CFT, Inc. and a company named L&D Installers, Inc., which is no

4

longer a party to this case. In her original complaint, DiMaria asserted claims against Goor, CFT, Inc., and two other defendants, which she later voluntarily dismissed from the action.

On March 11, 2009, the defendants removed the action to this court on the basis of diversity jurisdiction. In response to a motion for summary judgment filed by Goor on December 4, 2009, DiMaria moved to amend her complaint. The First Amended Complaint was deemed filed as of December 15, 2009. In her complex First Amended Complaint, DiMaria asserted nine claims against Goor, the CFT Entities and a few other defendants, on behalf of herself, her husband's estate, and derivatively on behalf of the CFT Entities.

In December 2009 and January 2010, the defendants named in the First Amended Complaint filed motions to dismiss and a motion for summary judgment. By memorandum and order dated September 30, 2010, I granted a number of the defendants' motions, simplifying the action. Of relevance here, I held that the 1992 Stockholders Agreement obligated Goor to purchase DiMaria's shares in CFT, Inc., but not in the other CFT Entities, and I declined Goor's motion for a declaration that the purchase price was zero.

On November 29, 2010, DiMaria filed her Second Amended Complaint, in which she asserted five causes of action. On July 28, 2011, I dismissed most of the claims asserted in the complaint except two: a claim for breach of contract against Goor (Count One); and a claim for unjust enrichment against the CFT Entities (Count Three).[4]

On January 13, 2012, Goor moved for summary judgment on the sole remaining claim against him. For purposes of his summary judgment motion, he does not dispute his liability to purchase DiMaria's shares in CFT, Inc. under the Stockholders Agreement.[5] Rather,

---

[4] DiMaria's third cause of action for unjust enrichment and restitution against the CFT Entities seeks repayment of an alleged $284,000 loan.
[5] In his moving papers, Goor offhandedly suggests other potential defenses to liability on this claim. However, Goor expressly limits his motion to seeking a determination that the purchase price is $0. *E.g.*, Goor

5

Goor seeks a determination that the Death Purchase Price he must pay for those shares is zero. I held oral argument on the motion earlier today.

## DISCUSSION

A.  *Summary Judgment Standard*

According to the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" under Rule 56 if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

B.  *Principles of Contract Interpretation*

The parties agree that New Jersey law governs the interpretation of the Stockholders Agreement.[6] Under New Jersey law, contracts are given their "plain and ordinary meaning." *E. Brunswick Sewerage Auth. v. E. Mill Assocs., Inc.*, 365 N.J. Super. 120, 125 (App. Div. 2004). "When the terms of a contract are clear, the court must enforce them as written." *Id.* The touchstone of contract interpretation under New Jersey law is "the intention of the parties to

---

Mem. at 8 (arguing that buyout provisions of Stockholder Agreement are inoperative in the absence of any payout of life insurance proceeds, but stating that "for purposes of this Summary Judgment Motion, the Court need not reach this issue").

[6] Article 16(h) of the Stockholders Agreement expressly states that New Jersey law governs the interpretation of the contract. Under New York's rules, which govern choice-of-law questions in diversity actions in this court, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941), a contractual choice-of-law provision is generally binding on a party claiming rights under the contract. *See, e.g.*, *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.").

the contract as revealed by the language used, taken as an entirety." *Onderdonk v. Presbyterian Homes of N.J.*, 85 N.J. 171, 184 (1981) (internal quotation omitted). Thus, even where contractual terms are not explicit, a court should find contractual terms to be implied "where the parties must have intended them because they are necessary to give business efficacy to the contract as written." *Id.* at 182 (quoting *New Jersey Bank v. Palladino*, 77 N.J. 33, 46 (1978)). "A court will, if possible, give effect to all parts of the instrument, and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable." *Maryland Cas. Co. v. Hansen-Jensen, Inc.*, 15 N.J. Super. 20, 27 (App. Div. 1951).

C. *Calculation of the Death Purchase Price*

As outlined above, Article 6 of the Stockholders Agreement sets forth a mechanism for determining the "Death Purchase Price" where, as here, the parties to the agreement failed to agree on the corporation's Value for more than two years. In such circumstances, the Value of the corporation is determined by taking the last agreed valuation – in this case, $2 million – and adding or subtracting the amount by which the "net worth" of the corporation has increased or decreased since the last valuation. That amount is to be calculated by the certified public accountant regularly employed by CFT, Inc. The Value is to be calculated as of the end of the month immediately preceding Mr. DiMaria's death, which the parties agree here is June 30, 2006.

In support of his argument that the Death Purchase Price is zero, Goor has submitted a letter from the corporation's certified public accountant, Mark I. Fink, stating that the "actual equity" in CFT, Inc. as of June 30, 2006, was a deficit of $5,814. Fink Letter at 1,

7

Feldman Cert., Ex. A (ECF No. 92-2).[7] From this premise, Fink concludes that the Value of CFT, Inc. as of June 30, 2006, was zero. *Id.* Fink does not attempt to determine what the net worth of CFT, Inc. was in 1992, nor to calculate the amount by which the net worth of CFT, Inc. increased or decreased between 1992 and 2006, except by reasoning backward to deduce that *if* the company's net worth was $2 million in 1992, then it *must have* decreased by $2,005,814 by 2006, in order to produce the $5,814 deficit. *Id.*

Goor contends that Fink's opinion proves that the Death Purchase Price of DiMaria's shares is zero (or, alternatively, a negative value). Goor first argues that the power to determine the company's Value is vested exclusively in Fink, as the certified public accountant regularly employed by CFT, Inc. Goor Mem. at 7; Goor Reply at 5. Secondly, Goor argues that "net worth" and "total value" are synonymous, and therefore Goor and Mr. DiMaria's agreement that the corporation's *total value* in 1992 was $2 million was effectively an agreement that the corporation's *net worth* in 1992 was $2 million. With that assumption, "simple math" demonstrates that the corporation's net worth *must* have decreased by $2,005,814 between 1992 and 2006, because the corporation's net worth in 2006 was a deficit of $5,814. Goor Mem. at 11.

DiMaria objects to both of Goor's premises. First, DiMaria contends that Fink's assessment of the Value of the corporation is not itself determinative; the Stockholders Agreement empowers Fink to determine the *change* in net worth of CFT, Inc., but the ultimate determination of the corporation's Value must be made in accordance with the formula laid out

---

[7] DiMaria properly objects that Fink's opinion is not "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Fink's opinion appears only in a letter and is not made under oath. However, I will assume for purposes of this motion that Fink would testify under oath to the opinion he asserts in his letter.

in the Agreement. DiMaria Mem. at 5. And, according to the Stockholders Agreement, the change in net worth must be determined by applying Generally Accepted Accounting Principles ("GAAP"). *See* Stockholders Agreement at 20, Goor Cert., Ex. A.

Second, DiMaria has submitted an affidavit of Stuart Becker, C.P.A., who contests Fink's valuation methodology. Becker Aff. (ECF No. 93-1). Becker states that in his opinion, "Mr. Fink has not demonstrated a methodology consistent with GAAP for determining that the change in net worth from December 31, 1992 to June 30, 2006 was or exceeded $2,000,000." Becker Aff. ¶ 9. In particular, Becker explains that under GAAP, "value" and "net worth" are not synonymous. GAAP defines "value" as the amount of money something is worth, while it defines "net worth" as assets minus liabilities, which is also referred to as "equity." *Id.* ¶ 5. Under GAAP, a company's value can be determined in many ways other than using its "book value," *i.e.*, assets minus liabilities. *Id.* ¶ 7. One example is the "income valuation method," which can produce a positive value for a company even where its "book value" is negative. *Id.* ¶ 8.

Goor responds by claiming that the "plain language" of the Stockholders Agreement reveals that Goor and Mr. DiMaria agreed that the net worth of CFT, Inc. as of December 31, 1992, was $2 million. Goor Reply at 4. Moreover, although Goor does not dispute Becker's assertion that there are many ways of determining a company's value, Goor argues that if the parties had wanted to require an income valuation methodology or some other valuation methodology, they "could have done so," but "they chose not to." *Id.* at 5. Goor impliedly concludes that the Stockholders Agreement imposes the book value methodology.

I conclude that the valuation methodology advanced by Goor is foreclosed by the plain language and evident intent of the Stockholders Agreement. Under Goor's reasoning,

9

whenever the parties have not agreed to a Certificate of Agreed Value for over two years, the company's Value is simply the same as its net worth on the last day of the month immediately preceding the decedent's stockholder's death. But this is not what the Stockholders Agreement says. The Agreement says that in such circumstances, the Value shall be "the amount set forth on the most recent Certificate of Agreed Value, *plus (or minus) an amount which reflects the increase (or decrease) in the net worth of the corporation from the date of the most recent Certificate of Agreed Value to the end of the month immediately preceding the . . . Decedent's death . . .* , as determined by the certified public accountant regularly employed by the Corporation, applying generally accepted accounting principles." Stockholders Agreement at 19-20, Goor Cert., Ex. A (emphasis added). This would certainly be an unnecessarily laborious description of the desired valuation method if the parties simply intended "Value" to mean the current net worth of the company. I cannot accept such an interpretation that would render the complex formula for determining Value carefully laid out in the contract "useless or inexplicable." *See Maryland Cas. Co.*, 15 N.J. Super. at 27.

Goor's reasoning also inverts the formula's independent and dependent variables. The contract clearly envisions the Value to be the dependent variable, which is to be calculated by inputting the known amounts of the most recent Certificate of Agreed Value and the change in net worth. Under Goor's reasoning, by contrast, first the accountant determines the Value by subtracting liabilities from assets; the accountant then inputs into the formula the Value and the last-agreed value, and then uses "simple math" to deduce (utterly unnecessarily) the change in net worth. This is clearly backwards.

Moreover, Goor's method renders irrelevant the most recent Certificate of Agreed Value, because Goor's method simply subtracts from that agreed value whatever amount is

10

necessary to render the Value equal to the net worth. That is, Goor's interpretation makes consideration of the Certificate of Agreed Value "useless" and unnecessary. *See Maryland Cas. Co.*, 15 N.J. Super. at 27. The clear intent of the Stockholders Agreement, however, is for the most recent Certificate of Agreed Value to have the potential to influence the ultimate measure of the Value. This is only possible if I decline to define "Value" as synonymous with "net worth."

Indeed, Goor's observation that the Stockholders Agreement is silent as to which particular valuation method it requires works against him. Although I cannot determine from the plain language of the Agreement exactly what valuation method the parties intended to be used in determining total value, I *can* determine that the parties plainly did *not* intend to use the "book value" methodology. Using the "book value" methodology, which equates a company's value to its net worth, leads inexorably to the facile conclusion that the company's Value is always equal to its net worth. This result undermines the clear language of the contract, which instructs the accountant to calculate the Value by subtracting the *change* in net worth from the most recent agreed valuation amount. Such a specific instruction would be wholly superfluous if the accountant could always short-circuit the instruction simply by equating the Value to the net worth. Therefore, the clear implication of the contract is that the corporation's value is not the same as its net worth.

I conclude that under the contract, Fink must calculate the *change* in the corporation's net worth between 1992 and 2006. To do this, Fink must calculate CFT, Inc.'s net worth as of December 31, 1992; he may not simply assume that the net worth was $2 million. Although the parties determined that the total value of the corporation was $2 million on December 31, 1992, this valuation may not have been (and almost surely was not) made

11

according to the corporation's "book value."[8] Because the corporation's net worth may have been substantially less than $2 million in 1992, subtracting the change in net worth between 1992 and 2006 from $2 million may produce a positive Value, even if the corporation's net worth in 2006 was a deficit.

## CONCLUSION

Because the Stockholders Agreement impliedly forecloses equating total value with net worth, Goor's motion for summary judgment is denied in its entirety.[9]

So ordered.


John Gleeson, U.S.D.J.


Dated: February 21, 2012
       Brooklyn, New York

---

[8] Indeed, Goor himself explained that the $2 million figure was chosen not based on any assessment of the corporation's assets and liabilities, but rather because it was the value of the life insurance policies that he and Mr. DiMaria planned to obtain, the proceeds of which were to be used to fund the forced stock purchase. *See* Goor Cert. ¶ h (ECF No. 92-3).

[9] Although I need not address the issue to decide this motion, I also reject Goor's suggestion that his buyout obligation was not triggered unless he received proceeds from an insurance policy on Mr. DiMaria's life. First, the Stockholders Agreement only entitles the surviving stockholder to the proceeds of insurance policies listed in Exhibit A of the Stockholders Agreement, and Exhibit A is blank. *See* Stockholders Agreement at 10, Ex. A. Second, Article 4(e) of the Stockholders Agreement makes clear that the obligation to buy the deceased shareholder's shares is independent of whatever insurance proceeds may be received, by stating that, "[i]f, however, the proceeds on the life of the Decedent are insufficient to fund the entire Death Purchase Price, *or there are no insurance policies on the Decedent's life*, the . . . Surviving Shareholder . . . shall execute a promissory note made payable to the legal representatives of the Decedent's estate for the unpaid balance of the Death Purchase Price, if any, after payment of all life insurance proceeds has been made, or, alternatively, *for the entire Death Purchase Price if there are no insurance policies on the Decedent's life*." *Id.* at 11 (emphasis added). Clearly, the surviving shareholder must buy the deceased shareholder's stock at the Death Purchase Price, whether the deceased shareholder had a life insurance policy or not.